SEDALIA NATIONAL BANK, Respondent, v. CASSIDY BROTHERS LIVE STOCK COMMISSION COMPANY, Appellant.

St. Louis Court of Appeals, December 13, 1904.

1. WEIGHT OF EVIDENCE: Chattel Mortgages. In an action to recover the proceeds of a lot of cattle sold by defendant and claimed by it under a chattel mortgage, and also claimed by plaintiff under a chattel mortgage, the evidence is examined and held sufficient to support a finding of the trial court in favor of the plaintiff.

2 PARTNERSHIP: Chattel Mortgage. One partner, without the consent of the other partner, cannot mortgage partnership chattels to secure his individual debt, so as to defeat the claims of partnership creditors.

3. JUDGMENT FOR RIGHT PARTY: Harmless Error. Errors in refusing declarations of law in a case tried without a jury were not prejudicial where the judgment of the trial court was clearly for the right party.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

AFFIRMED.

*R. M. Nichols* for appellant.

*D. P. Dyer* and *Sangree & Lamm* for respondent.

(1) The defendant claims under the Hess mortgage and as an individual creditor of Hess. Such claim is worthless and such mortgage is utterly void as to the firm creditors whether the firm is solvent or insolvent, but especially when insolvent (as here). Jones on Chattel Mortgages (4 Ed.), sec. 45; Ewart v. Nave-McCord, etc. Co., 130 Mo. 117, 31 S. W. 1041; Harvey et al. v. Stephens, 159 Mo. 486, 60 S. W. 1055; Implement Co. v. Corbin, 83 Mo. App. 438. (2) Even without a mortgage we could pursue the proceeds of the firm property appropriated by an individual creditor, under an individual mortgage. Talbott v. Plaster Co., 86 Mo. App. 558; Mansur-Tebbets, etc. Co. v. Ritchie, 143 Mo. 587, 45 S. W. 634; Wagon Co. v. Rummell, 12 Fed. 658, 2 McRary, 207.

### STATEMENT.

Plaintiff and defendant are both corporations. The plaintiff's evidence shows that in 1901, J. L. Cartwright and R. J. Hess formed a partnership to deal in cattle and hogs. After the partnership arrangement was entered into, they continued to deal with the world as such, bought cattle and borrowed money as partners, opened a partnership bank account and drew checks against the account in the partnership name, and executed promissory notes and chattel mortgages, as partners. Cartwright lived in Pettis county, and Hess resided in Saline county, Missouri. About the first of December, 1901, Cartwright & Hess arranged with the plaintiff bank, in Sedalia, Missouri, for bank accommodations to the amount of eight thousand dollars, to be used in buying cattle, hogs and feed, and bought of the Chicago Live Stock Commission Company, in Kansas City, Missouri, one hundred and

twenty-four head of Angus, Hereford and Shorthorn cattle and sundry feed and hogs elsewhere. By prior arrangement, the cattle were paid for by draft drawn against Cartwright and Hess, directed to plaintiff bank. The cattle were shipped to Hughsville in Pettis county and from there were driven to the farm of John Hay, also in Pettis county, where early in December they were castrated and dehorned and were fed and wintered on this farm. In April, 1902, they were driven to land belonging to Blair and Bothwell (respectively cashier and president of plaintiff bank) in Saline county, and kept there until late in November or early in December, 1902. They were then driven from the Blair and Bothwell land to the farm where Hess lived, lying partly in Saline and partly in Pettis county. A few months later they were driven to the Jones farm, also lying partly in both counties, where they remained until April 7, 1903, when ninety-one head were shipped to market.

On December 10, 1901, Cartwright & Hess, at the city of Sedalia, gave plaintiff their note for eight thousand dollars, signed "Cartwright & Hess" and "J. L. Cartwright" and "R. J. Hess," to secure which they executed, in the same manner, their chattel mortgage on the one hundred and twenty-four head of cattle purchased of the Chicago Live Stock Commission Company, and a lot of hogs and feed. The cattle were described as steers located on the Hay farm in Pettis county. The mortgage was duly recorded in Pettis county where Cartwright resided, but not in Saline county. for the reason the bank officers supposed Hess was also a resident of Pettis county. It is not shown in the evidence that any of the bank officers saw the cattle at this time or knew they had been freshly castrated.

The original note of eight thousand dollars was renewed from time to time. The last note of the series of renewals remains due and there is a balance of about $6,725 due on the original note. The original note and

the renewal ones, except the last, were stamped "paid" by the bank but were retained in its possession.

Defendant's evidence shows that Hess was indebted to it in a sum exceeding twenty thousand dollars and had given mortgages on cattle from time to time to secure his indebtedness but many of these cattle were never found. Hess was not produced as a witness at the trial. On February 20, 1902, defendant made a loan to Hess of $2,570, evidenced by his individual note and secured by his individual chattel mortgage on "seventy-five head of two and three-year-old stag cattle, colored red, roan and black, most of them branded with a bar or slash," described as cattle bought for Hess by the Chicago Live Stock Commission Company at Kansas City, Missouri, and "now located on my farm near the town of Wanamaker in Saline county, Missouri." In the spring of 1903, Hess was heavily indebted and his individual creditors were pressing him. Cartwright, being informed of this fact, advised the bank to take possession of its mortgaged cattle and ship them to market. At this time there were ninety-one head of these cattle. Cartwright & Hess had another lot of partnership cattle consisting of sixty-six head mortgaged to the Chicago Live Stock Commission Company. These two lots had been together since the spring of 1902 but were easily distinguishable. Hess had one hundred and thirty-five head of individual cattle which were not mixed with the partnership cattle. The bank directed Cartwright to drive the cattle mortgaged to it to Hughsville, a shipping point on the Missouri Pacific Railroad, and ship them for and in the name of the bank to the defendant, as consignee, at East St. Louis, Illinois, to be sold on the market and accounted for to the bank. In pursuance of these instructions, on April 7, 1903, Cartwright drove the ninety-one head of bank cattle and sixty-six head mortgaged to the Chicago Live Stock Commission Company to Hughsville, intending to put them in separate pens and ship them to market

in separate cars. On his arrival at Hughesville, he found that Hess had his one hundred and thirty-five head of individual cattle in the pens and they were so crowded that it was impossible to entirely separate the bank's cattle from those belonging to the Chicago Live Stock Commission Company. In this dilemma, Cartwright concluded to separate the cattle when he reached East St. Louis. To carry out his instructions from the bank as near as possible under the circumstances, Cartwright shipped five carloads of cattle in the name of the Sedalia Bank, Cartwright & Hess, and four cars in the name of the Chicago Live Stock Commission Company, Cartwright & Hess. The one hundred and thirty-five head of cattle belonging to Hess individually were shipped in seven or eight cars and consigned to the defendant, who held mortgages on them. Hess's cattle were never at any time mixed with the cattle mortgaged to the bank. The seventeen carloads of cattle thus shipped arrived in East St. Louis and were delivered in pens to the National Stock Yards Company on April 8th, accompanied by Cartwright & Hess, and were on that day sold by the consignees. Before any sales were made, the sixty-one head of cattle mortgaged to the Chicago Live Stock Commission Company and the ninety-one head mortgaged to the bank were separated and put in different pens. But there is a conflict in the evidence in respect to the purpose for which the separation was made. There was a total of eighty-five head of cattle shipped in the five cars consigned by the bank to defendant. It is clear that fifty-three head of these cattle were mortgaged to the bank and thirty-two head were mortgaged to the Chicago Live Stock Commission Company, and that thirty-eight head mortgaged to the bank were shipped in cars consigned to the Chicago Live Stock Commission Company but were separated from the sixty-six head mortgaged to the latter company after arrival at East St. Louis.

Bright, a representative of defendant and also of

Cartwright & Hess, was present when the cattle were separated. Cartwright testified that the object of the separation was to get the cattle mortgaged to the bank in separate pens so that separate accounts of sales could be made and the correct amount paid over to the bank. The evidence of Bright is that they were separated for the purpose of enabling the defendant to get its hands on them, claiming them to be the individual cattle of Hess which he had mortgaged to the defendant.

The defendant and the Chicago Live Stock Commission Company jointly sold the car of partnership cattle under an agreement that defendant should have the entire proceeds of the five carloads consigned to it by the bank, and the Chicago Live Stock Commission Company the entire proceeds of the four carloads consigned to it. After the sales, plaintiff telegraphed defendant asking for an account of the proceeds of the sale of the ninety-one head covered by its mortgage which defendant promised but failed to render. A number of telegrams and telephone messages were passed between the bank officers and the officers of defendant from which it appears that defendant held out promises to render an account of the sale as soon as the tangle caused by mixing the cattle in shipment could be straightened out. A long correspondence was afterwards kept up by letter, culminating finally in notice to the bank that defendant claimed all the cattle as the individual cattle of Hess upon which he had given a mortgage to the defendant, and that it had applied the proceeds of the sale to Hess's indebtedness. The suit is to recover the proceeds of the sale of the ninety-one head of cattle mortgaged to the bank. The issues were submitted to the court without the intervention of a jury. The court found the issues for the plaintiff and that it was entitled to recover for fifty-two head of cattle, assessing the damages at $2,650.10. Defendant appealed.

BLAND, P. J. (after stating the facts).—It seems to us that the state of facts, as shown by the record in this case, is sufficient to sustain the finding of the learned trial judge, who certainly found the issues as they should have been found and rendered the proper judgment in the case. The cattle mortgaged to the bank were kept in hand, located and accounted for every day from the day they arrived from Kansas City, Missouri, to the day that they were put in the pens of the National Stock Yards at East St. Louis and sold on the market by the defendant; while the seventy-five head of cattle, if there were any such cattle, mortgaged on February 20, 1902, by Hess to the defendant, are not accounted for at all. There is, in fact, no substantial evidence that any one ever saw these seventy-five head of cattle. Hess did not testify and Bright's evidence, the only witness who ever pretends to have seen the cattle, is wholly unsatisfactory and his pretended identification of them is a mere guess. If Hess owned seventy-five head of cattle when he gave the mortgage, they certainly were no part of the partnership cattle of Cartwright & Hess, for these cattle were not Hess's individual cattle and were not located in Saline county, where the Hess mortgage described his seventy-five head of cattle to be located at the time the mortgage was given. The cattle mentioned in the bank mortgage are described as "steers." The cattle mentioned in defendant's mortgage given by Hess are described as "stags." It was shown in evidence that the ninety-one head of cattle mortgaged to the bank were what is known by the trade, as stags. On this slender shred of evidence, defendant bases its claim that the cattle, in the face of the overwhelming proof that these cattle, whether steers or stags, were the identical cattle covered by the bank's mortgage. The error, if it was error, in classifying the cattle as steers, in the bank's mortgage, when they should have been classified as stags, in view of the fact that the breeds, ages, colors and location of the cattle

were correctly stated in the mortgage, did not invalidate it, nor could Bright, if he is an ordinarily prudent man, have been misled by this erroneous classification, as he in his evidence claims he was; but whether he was or not, is wholly immaterial to any issue in this case, since it clearly appears that this ninety-one head of cattle were partnership cattle and for this reason could not be mortgaged by Hess, one member of the partnership, without the consent of the other member, for the purpose of securing his individual debt so as to defeat the claim of the partnership creditors. [Ewart v. Mercantile Company, 130 Mo. l. c. 117, 31 S. W. 1041; Harvey v. Stephens, 159 Mo. 486, 60 S. W. 1055; Rock Island Imp. Co. v. Corbin, 83 Mo. App. 438.] The bank was a partnership creditor and took possession of the cattle as such and had the shipment made in its own name and was, independent of its mortgage, entitled to the proceeds of the sale as a creditor of the partnership of Cartwright & Hess.

The court refused a number of declarations of law asked by the defendant. Whether these declarations were correct or not is immaterial, for the reason the evidence is so clear and convincing that the judgment is for the right party; that error in refusing declarations of law, the issues having been submitted to the court, was not prejudicial and does not call for a reversal of the judgment.

The judgment is affirmed. All concur.